## AUERBACH CO. et al. v. INDUSTRIAL COMMISSION et al.

No. 7144.   Decided June 25, 1948.   (195 P. 2d 245.)

See 71 C. J., Workmen's Compensation Acts, sec. 423. Injury to employee during participation in, attendance at, or transportation incident to games or other recreational activities of employees arising out of and in course of employment within Workmen's Compensation Act, see note, 115 A. L. R. 993.

*Shirley P. Jones,* of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen., *S. D. Huffaker,* Deputy Atty. Gen., and *Keith Browne,* of Salt Lake City, for defendants.

PRATT, Justice.

This matter is before us to review the decision of the Industrial Commission awarding compensation to one Rela Wardle, as an employee of the Auerbach Company, for in-

juries arising out of an automobile accident, alleged to have arisen out of, and in the course of, her employment.

Miss Wardle was employed as a cashier of the Company. She was a basketball player, and played upon a team sponsored by the Company as a part of their public relations and advertising campaign. She was not, however, hired as a basketball player. She was paid only as a cashier; but, when she made trips with the basketball team, her expenses were paid. The expenses of all members of the team were paid while on trips, even though the players were not all employees of the Company. When Miss Wardle was hired as a cashier, no conditions were attached to her employment or salary that she should play basketball, when requested. Her playing was voluntary, and the Company never required her to play if she did not care to do so.

So far as the Company was concerned the control of the team was in the hands of the public relations officer of the Company. The team coach was a soldier from one of the nearby camps. The Company also sponsored a softball team, of which Miss Wardle had been a member. This team had uniforms furnished by the Company upon which the word "Shamrocks" appeared, and they were known as the "Auerbachs Shamrocks." The public relations officer of the Company had been connected with this team prior to his employment as public relations officer. Not all players of either team were employees of the Company, and, at certain times when the softball team was away from Salt Lake, non-employee members did receive some pay to compensate them for being taken away from their jobs. Any income from the games went to the Company; but in amount it was hardly sufficient to keep up with the team expenses.

The accident happened at night, after Miss Wardle's duties as cashier had ended for that day. She was riding in an automobile driven by a Miss Green who was not an employee of Auerbach's, nor was she a basketball player. The Company, however, was furnishing the gas for her trip. Another basketball player, an employee of the Company— a Miss Domayne—was also riding in that car. They were on

their way to Provo, Utah, for a game. Miss Wardle had not been required to make the trip, but was going because she wanted to. That night the soldier-coach was not present or in charge, nor was the public relations officer in charge or present. The team was under the control of a certain police officer, who was a basketball coach and had been given charge in the absence of the other two men. On the team this night were seven girls, two of whom worked for the Company, and five of whom did not.

Miss Wardle had played for the Company at times when she was not employed by them. She worked temporarily for the Company at first, then quit to finish school. After finishing school she went back to see about re-employment and as the public relations officer knew her and knew her ability as a player, he recommended her employment. His personal liking and desire for her playing ability, however, was in no way connected to the Company employment as a condition of employment in the position of cashier.

Upon these facts the Industrial Commission found that Miss Wardle was injured in the course of her employment. We think the Commission was in error.

The Company did not employ Miss Wardle, nor any of the other players as basketball players. The Company is in the dry goods business, not sport promotion. The issue is limited to a question of whether or not as part of her employment as cashier she was under the duty of playing basketball. We think not. No such condition was attached to her contract of employment. She was under no direction or control by the Company that required her participation. There is, of course, nothing in the nature of a cashier's duties, as such, that by implication includes a duty of basketball playing. As a result, if there is an absence of evidence of any express requirement to include that duty in the position, and an absence of any proof of facts that clearly show that the one position included the two duties—cashiering and basketball playing — the applicant must fail.

In this case, one of the most important elements of the master-servant relationship is missing—that of the right to control the employment. Right to control in this case does not mean merely coaching control, the purpose of which is to produce teamwork when the alleged employee plays; but means the right to require performance of a duty to play, if such a duty exists.

Furthermore, there is no pretense that Miss Wardle was paid as cashier on a basis that included the playing of basketball as an element of qualification.

A case very similar to the present case is that of *Industrial Commission* v. *Murphy*, 102 Colo. 59, 76 P. 2d 741, 115 A. L. R. 990. There a baseball manager was injured in an automobile while returning from a company game. The team was maintained as a morale builder for the men as they had no form of recreation. The Company matched all contributions toward the team; and the funds received from games were used as expense money.

The baseball manager maintained he was under compulsion to attend and act in his capacity as manager. The court held otherwise, however. The case cites other authorities along the same line, and criticizes one from Missouri with an opposite conclusion.

Miss Wardle was no more an employee than was the participant in the midget automobile race of the *Intermountain Speedways* v. *Industrial Commission*, 102 Utah 126, 127 P. 2d 1045 (see also a similar case in *Intermountain Speedways* v. *Industrial Commission*, 101 Utah 573, 126 P. 2d 22). These cases emphasize the element of right to control, and point out that it does not mean just any control. Participants in a contest are subject to control for the purposes of safety; teamwork on a basketball team is subject to control for purposes of efficiency in playing. Neither however, is the control contemplated by the Workmen's Compensation Act. Utah Code 1943, 42-1-1 et seq.

We are of the opinion that Miss Wardle was not an employee so far as her relationship to the Company as a basketball player was concerned; and her injury did not

arise out of or in the course of, her employment as a cashier.

The award is set aside.

McDONOUGH, C. J., concurs.


WADE, Justice (concurring in result).

I concur with the result on the grounds that the evidence does not disclose that Miss Wardle was injured by accident arising out of or in the course of her employment. I do not think the evidence is sufficient from which it could reasonably be inferred that Auerbach Company entered into a contract to employ Miss Wardle to play basketball or to attend this basketball game and in doing so to act under its direction and control and therefore this award cannot stand.

The fact that she was regularly employed as a cashier for the company does not shed any particular light on the question because playing basketball was not one of her duties as such cashier. However, I have no difficulty with the concept that a department store might enter into a contract with the members of a basketball team whereby it employed them to play basketball for it and to go to and return from such games, and to practice and prepare themselves for such games, all as its employees and in so doing to act under its direction and control. If such was the contract between these parties then she would be entitled to recover, regardless of whether she was otherwise regularly employed by the company or not. If there was such a contract the fact that the company did not require her to play basketball in order to retain her regular job would be immaterial. But to meet the requirements there must be a showing that the injury arose out of or in the course of her employment.

Such a contract would not have to be in writing nor the exact terms thereof be proved by evidence of express statements to that effect, but if the surrounding circumstances

were sufficient it might be inferred therefrom. But I do not think that the surrounding facts and circumstances were here sufficient to justify an inference that such a contract of employment existed. Here the relationship between the company and the members of this team was very haphazard, the team existed independently of the company, was organized before it had any connection with the company; there was no regular schedule of games; there were no requirements that they meet certain training rules, or that the team would act under the control of a manager employed by the company, the members of the team were not paid anything for their services. The company encouraged the girls to play basketball, it furnished certain expenses including transportation, its department of public relations arranged some of the games and some of the details connected therewith, it collected the gate receipts and obtained certain advertisement advantages from the games. In my opinion this is not sufficient from which a contract of employment vesting in the company the right of control over the members of this team can reasonably be inferred.

WOLFE, Justice (concurring).

I concur. However, I think that the prevailing opinion fails to give any consideration to the arguments advanced by counsel for the applicant. In view of the earnestness with which those arguments are urged upon us, and in view of the fact that we must set aside the award of the commission, I think that the contention of the applicant should be more fully treated.

The argument advanced in support of the commission's award is that Auerbach Company, as part of its internal organization, had a department 65 which was concerned wholly with athletic teams sponsored by the company; that the public relations officer was in charge of this department; that all expenses of the team were paid for by the company and that any receipts from the efforts of the athletic teams, such as gate receipts and prize money were paid into the company's general fund; that the company

received valuable advertising and promoted the good will of the public by its athletic teams; in short, that the teams were an integral part of the Auerbach Company organization.

This argument finds support in the record. It seems clear that Auerbach Company enjoyed substantial benefits in the form of public good will, by reason of the public interest in the team. And counsel has cited to us cases where, under facts similar to those in the case at bar, compensation has been allowed. The strongest of these cases is *Le Bar* v. *Ewald Bros. Dairy,* 217 Minn. 16, 13 N. W. 2d 729; but see also *Holst* v. *New York Stock Exchange,* 252 App. Div. 233, 299 N. Y. S. 255; *Piusinski* v. *Transit Valley Country Club,* 259 App. Div. 765, 18 N. Y. S. 2d 316; *Dowen* v. *Saratoga Springs, Comm.,* 267 App. Div. 928, 46 N. Y. S. 2d 822; *Linderman* v. *Cownie Furs,* 234 Iowa 708, 13 N. W. 2d 677; *Fagen* v. *Albany Evening Union Co.,* 261 App. Div. 861, 24 N. Y. S. 2d 779; and *Scott* v. *Whitehouse & Co.,* 255 App. Div. 733, 6 N. Y. S. 2d 916. These cases, in general, support the view that where the employee is engaged in social, athletic, or recreational activities sponsored by his employer, and the employer benefits, even indirectly, from such activities, and the employee is injured while engaging in such activities, or while traveling to or returning to his home from such activities, then he is entitled to compensation.

The fallacy of this view is that the test of the employer-employee relationship is not whether or not the purported employer is benefited by the actions of the purported employee. A person or business organization may be materially benefited by an independent contractor, or by a volunteer.

It is obvious that regardless of whether or not the prime motive in sponsoring a team is to reap the benefits of the advertising thereby attained, all sponsors will receive, either as a direct or incidental benefit, advertising benefits to the extent that games played by their teams are patronized by the "fans," and to the extent that results and reports of such games are publicized in the newspapers and on the

radio. But whether the chief purpose of the sponsor is advertising, or some more philanthropic motive, I regard as immaterial here.

As noted in the prevailing opinion, the fundamental test of employer-employee relationship is right of control. And where the player plays voluntarily, of his own choice, during his off-duty hours, and is free to play or not to play as he determines of his own choice, it cannot be said that the sponsor has that right of control which makes it an employer and the player an employee, within the meaning of the Workmen's Compensation Act. And the result is not changed by the fact that the player is in the regular employ of the sponsor, and that he is occasionally excused from performing his regular duties in order to perform with the team. Nor is the result changed by the fact that the sponsor bears the expense of transporting the team, and other traveling expenses, when the team plays out of town.

To allow applicant compensation in this case would be to hold, in effect, that all amateur athletes, playing on any sponsored team, are employees of the sponsor, whether such sponsor be an industrial or commercial institution, a civic club, a church, or an educational institution such as a high school or university. Since most sports entail some risk of injury, it is likely that, in the event of such a holding, the support of many sponsors would be withdrawn, as they would be unable or unwilling to assume the financial burden of providing compensation insurance for their players. Thus many persons desirous of playing in organized leagues would be denied the opportunity to do so, and persons who derive their recreation from attending athletic games and matches would also be deprived of that source of entertainment. Players who participate in the games understand and willingly assume the risks. To throw the burden of such risks upon the sponsor would be, in effect, to destroy, or at best, to impair substantially the growth and development of amateur athletics. Such a result is not to be desired.

The average amateur player is not an employee of the sponsor of his team, within the meaning of the Workmen's Compensation Act. Measured by the oft repeated and now well established principle of "right of control," the sponsor-player relationship is not, in the ordinary instance, an employer-employee relationship.

I recognize that there are instances where a player of unusual ability is employed by a business organization, with the understanding, express or implied, that such player will play on the sponsor's team, and that he is being employed for the chief purpose of securing his athletic abilities to the employer, and not for the services he may render in furtherance of the employer's usual business. In fact, he may have only token duties outside of his duties as a player. In that situation the player may have, as his duties, the playing of the game, and he may be entitled to compensation for injuries received in connection with his athletic services. But that is not the situation here presented. It appears that plaintiff was employed by defendant as a cashier, and she was not required to play in order to hold her job. Her playing was wholly voluntary on her part, and completely separate from and independent of her duties as a cashier. She played because she wanted to, and not because she was required to. She had played as a member of Auerbach sponsored teams before she was ever employed by the company as a cashier. She continued as a member of the team when her employment terminated and she returned to school. And she was reinstated as an employee when she recovered from the injuries sustained in the automobile accident, although she was still incapacitated from playing. Not by any stretch of the imagination can she be deemed to have been engaged in the course of her employment during the time she was engaged in athletic activities, or traveling to or from the games.

LATIMER, J., concurs in the result.